# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 5:18-cv-01096-RGK-JC | | Date | July 23, 2019 |
|---|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | | |

| Present: The Honorable | R. GARY KLAUSNER, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Sharon L. Williams | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendant: |
| Not Present | | Not Present |

**Proceedings:** (IN CHAMBERS) Order and Judgment re: Court Trial

## I.    INTRODUCTION

MAG Aerospace Industries, LLC ("MAG"), which does business as Zodiac Water & Waste Aero Systems, filed the present lawsuit against Precise Aerospace Manufacturing, Inc. ("Precise") on May 23, 2018. MAG's Complaint alleges: (1) conversion; (2) breach of oral and written contract; (3) claim and delivery; (4) negligent interference with prospective economic relations; (5) fraudulent inducement; and (6) violation of California Business and Professions Code § 17200 ("§ 17200"). After pretrial motions, MAG's conversion, breach of contract, and negligent interference with prospective economic relations claims remained.

The crux of MAG's remaining claims involves Precise's possession of MAG's "molds," which Precise used to injection-mold plastic component parts that MAG ordered from Precise.

A bench trial was held on June 18 and 19, 2019. After reviewing the record and considering the arguments and evidence presented at trial, the Court took the case under submission. For the following reasons, the Court **ENTERS JUDGMENT IN FAVOR** of MAG on its conversion and breach of contract claims and **DISMISSES** MAG's negligent interference with prospective economic relations claim.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

This opinion serves as the findings of fact and conclusions of law required by Federal Rule of Civil Procedure ("Rule") 52. Fed. R. Civ. P. 52. Any finding of fact that actually constitutes a conclusion of law is adopted as such, and vice versa.

### A.    Findings of Fact

MAG manufactures water-and-waste systems for commercial airplanes built by original equipment manufacturers ("OEMs"). MAG is organized under the laws of Delaware and has a principal

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

place of business is in New Jersey. Precise is a California corporation that specializes in precision manufacturing of plastics for the aerospace and defense industries.

1.     *Zodiac I*

This action arises out of the second of two disputes between MAG and Precise. (*See* Precise Aerospace Manufacturing, Inc. v. Zodiac Water & Waste Aero Systems, Case No. 2:17-cv-01239-RGK-JC) ("*Zodiac I*".) In late 2012, MAG entered a subcontract with Precise whereby Precise agreed to manufacture injection-molded plastic component parts for MAG. Because the parts were specially designed, MAG supplied the unique "molds" that Precise would use to manufacture the parts. After Precise delivered the finished parts, MAG would assemble the parts into water-and-waste systems for OEMs.

On January 17, 2017, Precise filed the *Zodiac I* suit against MAG, alleging that MAG had breached an oral "exclusive supplier" contract by hiring another company to manufacture injection-molded plastic component parts. MAG then filed a counter-complaint against Precise on May 8, 2017, alleging that Precise had made low-quality parts and failed to return two of MAG's molds in violation of several of the parties' contracts.

Relevant here, MAG alleged in its counter-complaint that Precise breached a contract by manufacturing two defective parts (the "312 and 313 Parts") and by failing to return the molds used to make each part (the "312 and 313 Molds"). As a result, MAG alleged that it was forced to duplicate the 312 and 313 Molds. But the Court found on summary judgment that MAG failed to present admissible evidence raising a dispute of fact as to whether the 312 and 313 Parts were defective, and thus whether precise breached the contract. As a result, MAG was unable to recover breach of contract damages for the costs it incurred to duplicate the 312 and 313 Molds.

In February 2018, the Court granted each party's respective motion for summary judgment. The case is now pending on appeal.

2.     *The 2017 Interim Agreement*

Shortly before Precise's complaint was filed in *Zodiac I*, on January 13, 2017, MAG wrote Precise a letter requesting that Precise return the molds it was no longer using to fulfill outstanding purchase orders. Precise initiated *Zodiac I* on January 17, 2017. The next day, Precise responded to MAG's letter stating that it was unable to return the molds because they would be evidence in litigation.

On February 2, 2017, MAG and Precise entered a written interim agreement (the "Interim Agreement") under which Precise and MAG agreed to temporarily continue their business relationship during the pendency of the *Zodiac I* litigation. In relevant part, the Interim Agreement provided that

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

MAG would continue to send Precise purchase orders for parts. To produce those parts, Precise would continue to use MAG's molds. It also specified: "While Precise is producing parts in response to the purchase orders, Precise will retain the molds." MAG agreed to order parts on a three-month basis and to give Precise sufficient lead time for delivery. The Interim Agreement was set to terminate on February 2, 2018, twelve months after its effective date.

### a.    *Mold Duplication Group 1: April 2017*

In March and April of 2017, however, MAG grew concerned with Precise's performance under the Interim Agreement. Specifically, MAG believed that Precise had manufactured two defective parts: the 312 and 313 Parts, discussed above. MAG's concerns eventually evolved into its *Zodiac I* counter-complaint.

Before filing its counter-complaint, on April 27, 2017, MAG demanded that Precise return the 312 and 313 Molds. Precise responded the next day that it would only return the molds if MAG first disclosed the results of an inspection of the 312 and 313 Parts. As discussed above, MAG believed that the 312 and 313 Parts were defective and hoped to use the 312 and 313 Molds to replicate those parts. Precise, however, disputed whether the parts were defective. It is not clear whether Precise received the information it requested.

Gil Lenhard ("Lenhard"), MAG's Vice President of Procurement, testified that because Precise refused to return its molds, MAG "ended up having to duplicate the tools for [the 312 and 313] parts to protect [its] customer deliveries" on April 21, 2017. To that end, MAG ordered duplications of Mold Part Nos. 38100-312 and 38100-313 for $37,192.50 and Mold Part No. 19600-020 for $19,031.25, incurring a total cost of $56,223.75. All orders were placed with Southern California Plastics.

The Court notes that the April 21, 2017 duplication order was placed *before* the correspondence about the return of the molds, discussed above.

### b.    *Mold Duplication Group 2: December 2017 – January 2018*

Another dispute arose in September and October 2017. MAG sent Precise a set of purchase orders pursuant to the Interim Agreement, but Precise refused to accept the orders because the shipment date fell outside the Agreement's February 2, 2018 termination date. MAG believed that all orders *placed* within the one-year time frame of the Agreement would be fulfilled, while Precise believed that it only agreed to accept orders that would be *shipped* while the Agreement was in effect. Because Precise required a six-month lead time to produce the ordered parts, the orders placed in September or October of 2017 would necessarily be delivered after February of 2018. For that reason, Precise rejected MAG's September and October orders outright.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

MAG then grew concerned about procuring the parts it needed to meet its assembly demands. To resolve its concerns, MAG decided to hire another company to manufacture the parts. To do so, MAG needed the molds associated with each part, which Precise held. On October 2, 2017, MAG asked Precise to return several molds. On November 9, 2017, MAG emailed Precise again requesting that Precise return a narrowed list of molds. First, MAG stated that Precise was in wrongful possession of the molds associated with completed purchase orders under the Interim Agreement. In the same email, MAG set deadlines for the return of the molds that Precise was still using to produce parts under existing purchase orders.

Precise did not immediately return MAG's molds. On November 27, 2017, in the *Zodiac I* litigation, MAG applied for a writ of possession seeking the return of the molds that it had requested in its November 9, 2017 email. But on January 10, 2018, the Court denied MAG's application because the molds requested were not mentioned in MAG's counter-complaint against Precise. The only molds at issue in the pleadings of *Zodiac I* were the 312 and 313 Molds, which were not included in MAG's demand list. As a result, the Court was unable to grant MAG's application because the injury it claimed differed from the conduct asserted in its underlying counter-complaint.

Before the Court denied MAG's request, however, MAG began duplicating the molds associated with parts that it felt it most needed to fulfill its outstanding contracts. MAG determined which molds to duplicate based on its internal "Materials Requirements Planning System" ("MRP System"), which forecasts the parts MAG needs to meet its customers' assembly demands.

MAG ordered the duplication of eleven[1] molds on December 22, 2017 and one mold on January 18, 2018. Lenhard estimated the total cost of this group as $185,000. The following molds were ordered from Southern California Plastics on December 22, 2017:

1. Mold Part No. 14330-253
2. Mold Part No. 15801-112
3. Mold Part No. 15801-113
4. Mold Part No. 14330-197
5. Mold Part No. 14320-223-1
6. Mold Part No. 14320-223-3
7. Mold Part No. 14320-148
8. Mold Part No. 14320-149
9. Mold Part No. 3800-183
10. Mold Part No. 15801-153
11. Mold Part No. 77000-505-506

---

[1] At trial, MAG stated several times that it duplicated ten molds on December 22, 2017. But pursuant to the December 22, 2017 purchase orders, MAG ordered eleven molds.

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | ***MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.*** | | |

The following additional mold was duplicated on January 18, 2018:

12. Mold Part No. 14320-231

As discussed above, MAG demanded the return of several molds on November 9, 2017, prior to ordering the twelve duplicates. Specifically, MAG's November demand email requested the "*immediate return*" of the listed molds that were "past due," or that were not associated with open purchase orders, and the future return "*by the date listed*" of the molds for which Precise was "still competing work." For the molds that Precise was still using to produce parts, MAG provided the date of the final delivery associated with each mold and demanded that Precise return the corresponding mold "5–10 days prior to the PO delivery dates."

Critically, the *only* mold that MAG asked Precise to return "immediately" and that MAG subsequently duplicated was Mold Part No. 77000-505-506. The other eleven molds that MAG duplicated, listed above, were either described in the email as still being used by Precise to complete open purchase orders or were not mentioned in the November 9, 2017 email at all.[2] For example, MAG asked Precise to deliver Mold Part No. 14330-253 by January 17, 2018. But MAG ordered the duplication of Mold Part No. 14330-253 on December 22, 2017, nearly a month before the date on which it expected its return.

The total cost to duplicate Mold Part No. 77000-505-506 was $29,879.88.

### 3. *The January 2018 Agreement*

While *Zodiac I* was still pending and before the Interim Agreement expired, on January 24, 2018, MAG and Precise met and orally agreed that MAG would place one final round of new purchase orders for $1.5 million worth of parts from Precise. Two individuals were present at the meeting. MAG was represented by Sebastien Weber ("Weber"), MAG's Chief Executive Officer ("CEO") for software passenger solutions. Precise was represented by its President and CEO, Roxanne Abdi ("Abdi"). Weber and Abdi agreed on the following terms: (1) MAG orders $1.5 million in new parts; (2) Precise manufactures the parts pursuant to MAG's written purchase orders; (3) the purchase orders are non-cancellable and not made under duress; (4) MAG pays 2016 pricing; (5) MAG provides Precise with raw materials; (6) Gil Lenhard "stay[s] away"; and (7) the parties end their relationship after the last orders are fulfilled.

---

[2] The molds duplicated on December 22, 2017 that were not listed in the November 9, 2017 email were also not listed in MAG's original demand letter in January 2017.

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | ***MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.*** | | |

MAG then sent Precise 71 non-cancelable purchase orders. To manufacture the parts, Precise used MAG's molds.

> a.     *Mold Duplication Group 3: May – July 2018*

On May 10, 2018, Precise placed a shipment hold on MAG's finished parts and claimed ownership over MAG's molds. Several possible motivations for the shipment hold were raised at trial: credit issues, an allegedly bounced check, and Precise's asserted ownership of the molds.

Abdi first informed MAG of the shipment hold in an email on May 10, 2018. Two hours earlier, at 5:04 p.m., Abdi emailed Weber that "per Payne and Fears, Precise is the owner of the molds." And in the email initiating the shipment hold, Abdi cited both "credit" and "tool issues." On May 15, 2018, Abdi wrote Weber a follow-up email stating that Precise had not heard from MAG since the shipment hold email. Abdi continued: "You need to sit down with me to go over credit issue and more importantly the molds that belong to Precise. Until such time that we reach an agreement there will not be any shipments. Any further delay in contacting me will result [i]n production hold."

Abdi testified at trial, however, that Precise initiated the shipment hold because MAG was late on payments and because of a bounced check. But while Abdi's testimony regarding the late payments is substantiated, the only issue presented at trial about a "bounced check" occurred in December 2018, months after the shipment hold was resolved. Based on timing alone, Precise's shipment hold could not have been inspired by the December 2018 check dispute. Therefore, unless Abdi was referencing another bounced check, the Court concludes that this portion of her testimony is inaccurate.

The Court notes for the record that Abdi's testimony at trial was unreliable for several additional reasons. Relevant here, Abdi testified that Precise did *not* stop shipment because it believed it owned MAG's molds. But Abdi was then impeached by her prior deposition testimony, where she stated that Precise instituted the shipment hold in part because MAG did not own the molds. Her emails, discussed above, also contradict her trial testimony. When presented with this evidence on cross-examination, Abdi conceded that she did claim to own the molds but explained that she only did so to "get MAG's attention."

The evidence does substantiate Abdi's testimony that MAG's missed payments led to the shipment hold. Robert Hayes ("Hayes"), MAG's Deputy Chief Financial Officer ("CFO"), explained that on the day of the shipment hold, MAG received notice that it owed Precise $14,600 in late payments. MAG investigated the problem and discovered that the late payments were caused by an internal accounting error in which the purchase orders were labeled with the wrong payment due date. On May 16, 2018, MAG dispatched payment and became current on its overdue invoices.

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|----------|----------------------|------|----------------|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

But Abdi asserted at trial that MAG did *not* become current on May 16, 2018. In fact, Abdi maintains that MAG has owed Precise an outstanding balance "at all times." But Precise presents no admissible evidence that after May 16, 2018, MAG owed Precise outstanding late payments.[3] The Court therefore concludes that MAG was current on its invoices after May 16, 2018.

Regardless, Precise did not lift the shipment hold. Precise then failed to deliver several parts by the agreed-upon delivery dates. As a result, on May 23, 2018, MAG filed the instant suit against Precise ("*Zodiac II*"). On June 11, 2018, MAG applied for a preliminary injunction and a writ of possession.

Meanwhile, MAG ordered two batches of molds from Southern California Plastics on May 23 and July 4, 2018. The purchase orders confirm that MAG spent $903,735 duplicating molds on those two dates. The orders were placed because of "urgent customer demand for the parts that were needed that [the molds] were going to create." Specifically, MAG believed that it needed to duplicate the molds because Precise had stopped shipping its ordered parts and because Precise claimed that it owned the molds.

On July 18, 2018, the Court entered a preliminary injunction ordering Precise to lift the shipment hold and to perform on MAG's existing purchase orders. The Court also granted MAG's application for writ of possession as to 52 specific molds without open purchase orders.[4] On July 24, 2018, Precise filed an undertaking to prevent execution on the writ of possession in which Roxanne Abdi, Noranne LLC, and Ron Harwood obligated themselves jointly and severally to MAG for up to $1,040,000.

After the Court's Order and Precise's bond, Precise lifted the shipment hold but retained the molds. MAG did not cancel its May or July 2018 mold duplication orders from Southern California Plastics because it would have been charged the full amount, even though the orders were not marked "non-cancellable."

---

[3] To show that MAG was past due on invoices, Precise offers two exhibits. First, Precise presents copies of four checks from MAG to Precise dated May 16, 2018 that appear to total $92,108.22 in payments. But these checks are not helpful. On the one hand, the checks appear to be attached to invoices that are *not* past due. Moreover, nothing in this exhibit relates to Abdi's testimony that the checks still "didn't satisfy the past dues." Precise also presents a document titled "AR Aging by Invoice." Abdi explained that this document reflects invoices owed to MAG as of May 1, 2018. But for obvious reasons, this document does not show that MAG owed Precise money in late payments *after* May 16, 2018.

[4] The Court incorporates by reference Attachment 1 of the Writ of Possession issued July 19, 2018, which lists the molds subject to MAG's first Writ. (*See* Attachment 1, Writ of Possession, ECF No. 40.)

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | ***MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.*** | | |

> ### b. *Mold Duplication Group 4: December – January 2019*

On January 10, 2019, MAG demanded that Precise immediately return the remainder of its molds because MAG learned that Precise had completed the molding for the January 2018 purchase orders. On January 11, 2019, MAG narrowed its request and demanded the return of ten specific molds associated with parts for which it had urgent demand, according to its MRP System.

Specifically, MAG demanded the return of the following molds:

1. Mold Part No. FM-02 86302-003
2. Mold Part No. FM-06 3800-068
3. Mold Part No. FM-08 77001-101
4. Mold Part No. FM-08 77001-103
5. Mold Part No. FM-08 77001-104
6. Mold Part No. FM-08 77001-110
7. Mold Part No. IM-38 7500963
8. Mold Part No. IM-38 7500964
9. Mold Part No. IM-38 7500965
10. Mold Part No. IM-53 38100-344-3

On January 14, 2019, Precise responded with a counter-offer: Precise would return the molds only if MAG agreed to pay "outstanding invoices and inventory including parts due next month." In the alternative, Precise invited MAG to request a quote from Precise to produce the parts for which MAG had immediate customer demand. Abdi confirmed that the molding using the ten molds listed above had been completed since September 2018.

MAG did not accept Abdi's request because it did not agree with every charge on the invoices, and it did not wish to pay for invoices that were not yet due. Moreover, MAG did not want to enter another contract with Precise. Instead, MAG ordered the duplication of ten molds on January 14 and 15, 2019 from Southern California Plastics.[5] The molds duplicated match the molds demanded in the January letter. The total duplication cost, according to the purchase orders, was $383,700.90.

---

[5] Lenhard testified that MAG duplicated eleven molds on January 15, 2019. But the purchase orders in evidence reflect one mold ordered on January 14 and nine molds ordered on January 15, 2019.

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | ***MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.*** | | |

### 4. *Total Mold Duplication Costs*

Precise returned the last of MAG's molds on April 29, 2019.[6] In the meantime, MAG estimates that it paid Southern California Plastics a total of $1,553,565 to duplicate 71 molds.

### B. Conclusions of Law

The Court has jurisdiction pursuant to 28 U.S.C. § 1332. MAG is a citizen of both Delaware and New Jersey, while Precise is a California corporation. The amount in controversy exceeds $75,000.

### 1. *Conversion*

"Conversion is the wrongful exercise of dominion over the property of another." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015). To establish conversion, MAG must prove: (1) MAG's ownership or right to possession of the molds; (2) Precise's conversion of the molds by a wrongful act or disposition of property rights; and (3) resulting damages. *Id.*

MAG owns the molds in question. But to prevail on its conversion claim, MAG must show that Precise wrongfully possessed each of the molds and that MAG suffered damages as a result. MAG's theory of damages rests solely on the costs incurred duplicating the molds.

For clarity, the Court examines the mold duplications in four groups.

### a. *Group 1: March and April 2017*

On April 21, 2017, MAG duplicated three of its molds: Mold Part Nos. 38100-312, 38100-313, and 19600-020. These duplications cost $56,223.75. To hold Precise liable for this cost, however, the Court must find that Precise wrongfully possessed these molds.

The written Interim Agreement governed during this time frame, so the Court begins by examining whether the Agreement addressed possession of the molds. Under California contract law,

---

[6] Precise filed a Notice of Return of Disputed Molds ("Notice") on April 30, 2019, stating that it returned "the last of the molds that are in dispute in this litigation." (*See* ECF No. 128.) Believing that the molds were returned, the Court granted summary judgment in favor of Precise on MAG's claim and delivery claim. (*See* ECF No. 146.) But MAG filed an Objection to Precise's Notice, declaring that nine molds were still not returned. (*See* ECF No. 141.) At the Pretrial Conference, the Court asked for clarification. MAG stated that nine molds had not been returned, while Precise stated that it returned the molds. The Court offered to reinstate MAG's claim and delivery cause of action. But at trial, MAG did not demand the return of the nine allegedly-missing molds or reassert its claim for claim and delivery. The Court therefore presumes that this claim has been abandoned.

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

the clear and explicit language of a contract directs its interpretation. Cal. Civ. Code § 1638. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." *Id.* § 1639. Each clause of the contract may be used to interpret the other, and the contract's terms are understood "in their ordinary and popular sense." *Id.* §§ 1641, 1644. When necessary, a contract "may be explained by reference to the circumstances under which it was made," to ensure that "it extends only to those things concerning which it appears that the parties intended to contract." *Id.* §§ 1647–48.

In relevant part, the Interim Agreement provides: "[w]hile Precise is producing parts in response to the purchase orders, Precise will retain the molds." The critical question is whether this term allows Precise to retain only the molds it is actively using to produce parts, or whether Precise may retain its entire collection of MAG's molds until it has completed the last of the Interim Agreement purchase orders. To be sure, the language is somewhat general: "producing parts" could mean "producing parts *using those molds*," and "the molds" could mean "the molds *that are currently in use.*"

But the parties elected to use general language—even though the Agreement was entered on the heels of a dispute about Precise's retention of MAG's molds. Specifically, shortly before the parties met to negotiate the Agreement, MAG had demanded that Precise immediately return all of the molds that Precise was finished using. MAG also outlined concrete future return dates for those molds still in use. After Precise refused, the parties negotiated the Interim Agreement.

But the Agreement did *not* specify that each mold needed to be returned after Precise completed the final part for each purchase order. Instead, the Agreement provided that Precise would retain "*the* molds," generally, "*while* Precise *is producing parts* in response to the purchase orders." A plain reading of the Agreement, read with reference to the surrounding circumstances, suggests that Precise was permitted to retain all the molds it had been lent until it finished producing all of the parts ordered in MAG's purchase orders. Once it was done producing parts for MAG under this yearlong Agreement, Precise would return the molds.

The alternative interpretation would be less reasonable. Given two possible constructions, courts will adopt the one that renders the contract term "effectual." *Service Emps. Int'l Union, Local 18, AFL-CIO v. Am. Building Maintenance Co.*, 29 Cal. App. 3d 356, 359 (Cal. Ct. App. 1972). "[I]t is reasonable to suppose that the parties meant something by their agreement." *Burns v. Peters*, 5 Cal. 2d 619, 623 (1936). If the parties intended that the term simply allow Precise to keep each mold while it was producing parts using that mold, the term would be meaningless: to fulfill its basic contractual obligations to produce parts using MAG's molds, Precise was surely permitted to retain each mold *while still using it.*

As a result, the Court interprets the Interim Agreement to allow Precise to retain the molds associated with purchase orders sent under the Agreement until Precise stops producing parts. Therefore,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | | Date | July 23, 2019 |
|---|---|---|---|---|
| Title | ***MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.*** | | | |

until the Agreement ended in February 2018, as long as Precise was still producing parts under pending purchase orders, Precise had the right to retain MAG's molds.[7]

Accordingly, MAG has not shown that Precise was in wrongful possession of the three molds that it duplicated in April 2017. MAG's conversion claim here fails.

> b.        *Group 2: December 2017 and January 2018*

MAG ordered its second group of duplications on December 22, 2017 and January 18, 2018, after MAG demanded the return of dozens of molds on November 9, 2017 and Precise refused.

Again, MAG must show that Precise wrongfully possessed the molds that it duplicated. The Interim Agreement governed from February 2, 2017 to February 2, 2018. Therefore, when MAG sent the November 9, 2017 demand letter, the Interim Agreement was still technically in effect. But the demand letter was sent in response to Precise's refusal to accept MAG's newest purchase orders, sent in September and October 2017.

Under the Interim Agreement's terms, a breach by either party terminates the Agreement. *See Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (Cal. Ct. App. 2011) ("When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract.").

The Interim Agreement provides that MAG will send Precise purchase orders for parts and "Precise will accept all purchase orders sent by [MAG]." The Agreement is "prospective in nature" and "applies to purchase orders made following the effective date" of February 2, 2017. Based on the plain language of the Agreement, Precise's refusal to accept purchase orders before the Agreement terminated in February 2018 is a breach of its promise to "accept all purchase orders" MAG sent following the Agreement's start date. The Agreement does not specify that Precise is only obligated to accept purchase orders that would be *delivered* before the termination date. Therefore, the Interim Agreement terminated prior to November 9, 2017. Precise was no longer permitted to retain MAG's molds pursuant to its terms.

Even so, Precise was still producing parts under pending purchase orders that it had previously accepted, and therefore was still using several of MAG's molds. As long as Precise was still contractually obligated to produce parts using MAG's molds, Precise had a right to retain the molds it

---

[7] Even if MAG's subsequent demand for the return of the three molds somehow triggered Precise's obligation to return them, MAG's demand letter was sent on April 28, 2017—seven days *after* it ordered the replacement molds. As a result, Precise's refusal to return this set of molds cannot have caused MAG's decision to duplicate them.

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

still needed. MAG's November 9, 2017 email indicates that MAG still expected Precise to fulfill its accepted purchase orders. But with one exception, the molds MAG duplicated in December 2017 and January 2018 were either still being used by Precise to fulfill open purchase orders or were not demanded in MAG's November letter in the first place. For those molds that Precise was still using, MAG set return deadlines ranging from early January to March 2018. Precise could not therefore have been in wrongful possession of those molds in December 2017. And for those molds not listed in MAG's demand letter, the Court has no way of knowing whether Precise was asked to return them or whether Precise had possession of those molds at all.

The sole exception is Mold Part No. 7700-505-607, which MAG demanded in its November 9, 2017 email and which was listed as having no open purchase orders. The cost to duplicate this mold was $29,879.88. Had Precise returned this mold when MAG demanded, MAG would not have needed to order its duplication.

In sum, MAG has shown that it owned Mold Part No. 7700-505-607, that Precise was in wrongful possession of this mold after November 9, 2017, and that MAG was forced to duplicate the mold as a result. Accordingly, Precise is liable to MAG for the conversion of Mold Part No. 7700-505-607 and owes MAG damages of $29,879.88.

        *c.*      *Group 3: May – July 2018*

MAG duplicated a third group of molds in May and July 2018 in response to the shipment hold. On May 10, 2018, Precise initiated a shipment hold that paused delivery of finished parts to MAG indefinitely. At the same time, Precise claimed that it owned MAG's molds. MAG has therefore shown that Precise had wrongful possession over its molds at this time.

MAG has also shown that it ordered dozens of molds from Southern California Plastics on May 23, 2018 and July 4, 2018. But to recover damages for conversion, MAG must also show that the molds it duplicated were the same molds that Precise wrongfully possessed or were covered by Precise's bond. In other words, MAG must prove that it incurred the duplication costs *as a result of* Precise's acts of conversion.

Lenhard testified that MAG duplicated 48 molds during the shipment hold because it faced urgent customer demand for parts made using those molds. Specifically, in its Complaint, MAG listed over 100 specific molds that Precise possessed as of May 23, 2018. MAG repeated the same list in its Application for Writ of Possession. Problematically, in both documents, MAG identified its molds using numbers starting at "FM-01" and "IM-01" (hereinafter, "FM/IM format"). (*See, e.g.,* Compl. 9–15, ECF No. 1.)

Weeks later, the Court granted MAG's Application for Writ of Possession as to 52 molds

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

without outstanding purchase orders, and Precise posted a bond to keep possession of those 52 molds. The Court's Writ of Possession incorporated those labels in turn. (*See* ECF No. 40.) But at trial, MAG presented purchase orders for duplicate molds labeled using eight- or eleven-digit identification numbers, such as "38100-312" or "77000-505-603" (hereinafter, "numeral format"). (*See, e.g.,* Trial Ex. 42.) The mold numbers in the Complaint and Writ of Possession do not match the mold numbers in the purchase orders, nor do they appear to be the same format.[8] But without a uniform labelling system or evidence connecting the two, the Court has no way to match the molds associated with the Court's July 2018 Writ of Possession with the duplication purchase orders from May and July 2018.

Put differently, the Court has no way of verifying whether the molds that MAG ordered from Southern California Plastics in May or July 2018 were duplicates of the 52 molds that Precise *wrongfully* possessed. Because when MAG filed its original Application for Writ of Possession in July 2018, it requested a writ for 102 total molds. But the Court found that Precise wrongfully possessed only those molds *without open purchase orders*, which constituted just 52 of the 102 identified molds. If any mold duplicated in May or July was a duplicate of a mold from the group of 50 that Precise *rightfully* possessed, MAG would not be entitled to conversion damages for that mold. And without evidence indicating which molds fell into which group, the Court cannot award conversion damages for this third group at all.

The Court notes that for the fourth group of molds duplicated in January 2019, discussed below, MAG identified each mold using *both* the FM/IM format and the numeral format. But the FM/IM format labels are associated with several different numerals: *i.e.*, Mold Part Nos. 77001-101, 77001-103, 7701-104, and 77001-110 are all also labeled as "FM-08." So even if the Court was able to deduce the numeral format associated with each FM/IM label, it appears that there would be some overlap.

Accordingly, MAG cannot win damages for the molds it duplicated in May and July 2018 under a conversion theory.

---

[8] The Court's Writ of Possession incorporated the mold numbers used in MAG's Complaint. (*See* ECF No. 40.) In the Complaint, MAG provided a chart listing each mold, its corresponding mold number, and its "Transfer or Build History." (*See* Compl. 9, ECF No. 1.) For some of the molds, MAG listed a corresponding purchase order issued by MAG to Precise. For "Mold No. FM-10," for example, it states: "PO # 2239785 Issued to Precise." Dozens of purchase orders from MAG to Precise were admitted into evidence at trial. Because FM-10 is one of the molds identified in the Writ of Possession with a label that does not match the duplicated molds list, the Court hoped that the purchase order number would help it identify the mold. But the Court looked for purchase order number 2239785, to no avail. The purchase orders in evidence do not contain the purchase order numbers associated with the molds listed in the Complaint.

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

### d. Group 4: January 2019

In January 2019, MAG demanded that Precise return ten more molds for which it had completed purchase orders. Precise refused. Abdi confirmed in her response email, however, that the molding was complete for those ten molds. Facing impending customer demands, MAG duplicated the ten molds for $383,700.90.

As a result, MAG has successfully proven its conversion claim arising from the ten molds duplicated in January 2019. MAG has shown that it incurred damages of $383,700.90.

### e. Total Conversion Damages

Under MAG's conversion claim, Precise is liable to MAG for $413,580.78.

### 2. Breach of Oral Contract

To adequately state a claim for breach of an oral contract, MAG must prove: (1) the existence of a contract; (2) MAG's performance or excuse for nonperformance; (3) Precise's breach; and (4) damages to MAG as a result of Precise's breach. *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008). Proof of damages for breach of contract must be established by reasonable certainty. *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 961 (9th Cir. 2001).

MAG's theory of breach of oral contract rests on Precise's alleged oral promise during the January 2018 meeting to return MAG's molds after each completed purchase order. But MAG did not show the existence of an oral agreement regarding the return of the molds. Accordingly, this theory fails.

### 3. Breach of Written Contract

To adequately state a claim for breach of a written contract, MAG must prove: (1) the existence of a contract; (2) MAG's performance or excuse for nonperformance; (3) Precise's breach; and (4) damages MAG incurred as a result of Precise's breach. *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008). Proof of damages for breach of contract must be established by reasonable certainty. *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 961 (9th Cir. 2001); *see also* Cal. Civ. Code § 3301.

### a. Existence of a Contract

The written contracts here are the purchase orders sent by MAG to Precise for injection-molded plastic component parts pursuant to the January 2018 Agreement. Each purchase order sets a price, a delivery date, and payment terms.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
| --- | --- | --- | --- |
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

b.    *MAG's Performance or Excuse for Nonperformance*

The first issue is whether MAG performed its payment obligations or has an excuse for nonperformance. Prior to the shipment hold, MAG owed Precise in late payments in violation of the purchase orders' payment terms. Therefore, if MAG's failure to perform constituted a material breach, Precise was discharged from its duty to ship the parts. "When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract." *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (Cal. Ct. App. 2011). Whether a breach of contract is material depends on "the importance or seriousness thereof and the probability of the injured party getting substantial performance." *Id.* at 278 (citing 1 Witkin, *Summary of Cal. Law Contracts*, § 852, pp. 938–40 (10th ed. 2005)).

MAG's untimely payments were not serious enough to release Precise from its duty to perform under the purchase orders. As soon as MAG learned that it missed payments, it remedied the error and became current on its invoices. MAG otherwise performed its contractual obligations as promised; Precise failed to convince the Court otherwise. Moreover, MAG's explanation for the missed payments—an inadvertent accounting error—was reasonable and excusable. Accordingly, these late payments did not rise to the level of a material breach. Precise was therefore still required to perform on the terms of the purchase orders as promised, including adhering to all delivery dates.

c.    *Precise's Breach*

The next issue is whether Precise breached the contracts. Actual breach of contract cannot occur until the time specified for performance has arrived. *Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975). But the evidence is clear: Precise suspended shipment between May 10 and July 19, 2018, and dozens of parts were scheduled for delivery during that time. Precise therefore breached the written purchase orders when the delivery dates arrived and the parts were not shipped.

Precise also committed an anticipatory breach of contract when Abdi initiated the shipment hold on May 10, 2018 and indicated that it would no longer deliver the finished parts. "An anticipatory breach of contract occurs when the contract is repudiated by the promisor before the promisor's performance under the contract is due." *Central Valley General Hosp. v. Smith*, 162 Cal. App. 4th 501, 514 (Cal. Ct. App. 2008); *see also Taylor v. Johnston*, 15 Cal. 3d 130, 137 (1975). The promisor repudiates the contract if it indicates that it "will not or cannot substantially perform essential terms thereof." *Crane v. East Side Canal & Irr. Co.*, 6 Cal. App. 2d 361, 367 (Cal. Ct. App. 1935). Repudiation may be express or implied. *Central Valley General Hosp.*, 162 Cal. App. 4th at 514.

Abdi's email signaled Precise's intention to indefinitely suspend the delivery of parts ordered in the purchase orders. As a result, Precise committed an anticipatory breach on May 10, 2018.

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

    *d.*    *Damages*

  The final element is damages. As discussed above, MAG has shown that it duplicated dozens of molds during the shipment hold.

  But MAG must also prove that the damages it incurred duplicating the molds were incurred *as a result of* Precise's breach during the shipment hold. Unlike MAG's conversion claim, MAG's breach of contract claim is premised on damages incurred because Precise refused to ship the *parts*, not because Precise refused to return the *molds*. This distinction is important.

  Precise's anticipatory breach of its outstanding purchase orders occurred on May 10, 2018. "When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time." *Taylor*, 15 Cal. 3d at 137.

  MAG seems to have elected the second remedy. By the time MAG sued Precise for breach of contract on May 23, 2018, Precise had already missed several delivery deadlines. Precise had therefore breached those purchase orders. The same day, MAG placed an order with Southern California Plastics to duplicate a set of molds. Some of the molds that MAG ordered were associated with already-late parts, while other orders would be used to make parts with near-future delivery dates. The parts MAG needed could only be made using MAG's unique molds.

  Rather than terminate the contractual relationship entirely, MAG moved for a preliminary injunction on June 11, 2018 asking the Court to order that Precise perform under the purchase orders and deliver its parts. The Court granted the preliminary injunction on July 18, 2018 and ordered Precise to lift the shipment hold and perform on the purchase orders as promised. In the meantime, MAG ordered a second set of duplicate molds.

  MAG explained at trial that during the hold, it duplicated dozens of molds associated with unshipped parts because it faced the immediate possibility of defaulting on its own contracts with OEMs. MAG relied on Precise's timely deliveries to meet its own assembly demands. After Precise declared its intention not to ship the finished parts *or* return the molds, MAG not only needed to find a new company to make its parts—it *first* needed to reacquire the molds for those parts.

  In fact, once Precise stated its intention to breach the unshipped purchase orders, MAG had a legal duty to mitigate its damages. *See Guerrieri v. Severini*, 51 Cal. 2d 12, 23 (1958) ("The duty to minimize damages is predicated upon the statutory rule that a person is required to use reasonable care to prevent an unwarranted piling up of damages.") (internal citations omitted). When it duplicated the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

molds, MAG had no way of knowing how long the shipment hold would last or whether it would ever regain possession of its molds. Eventually, if MAG did not find another way to procure the parts, it would face delay penalties or lose its contracts with OEMs altogether. MAG's decision to duplicate its most urgently-needed molds constituted a reasonable attempt to mitigate damages. Moreover, it was reasonable under the circumstances to duplicate the molds MAG needed the soonest *before* the missed delivery date of their associated parts and before the Court ruled on the preliminary injunction. Before MAG could order a replacement part, it needed the part's mold; and since Precise withheld its molds, MAG needed to duplicate them. Each mold might take months to build. As a result, MAG has shown that Precise's breach of the purchase orders caused MAG to incur these duplication costs.

Precise argued at trial that MAG had a duty to cancel the mold orders once Preicse resumed shipment. To be sure, Precise shipped the late parts on July 19, 2019. At this point, the duplication of molds for those shipped parts became unnecessary. But weighing the evidence, MAG has shown that cancellation would have been futile. On the one hand, the orders to Southern California Plastics were not marked "non-cancellable." But on the other hand, MAG would still have been charged the full amount if it did try to cancel.

Accordingly, MAG has shown that the shipment hold caused it damages under a breach of contract theory. Had Precise not indefinitely halted shipment, MAG would not have spent $903,735 duplicating a group of its molds.

### e. Conclusion

For the foregoing reasons, MAG prevails on its breach of contract claim and is awarded damages of $903,735.[9]

### 4. Negligent Interference with Prospective Economic Relations

To succeed on a claim for negligent interference with prospective economic relations, MAG must show: (1) an economic relationship between MAG and a third party containing a probable future economic benefit to MAG; (2) that Precise knew about the relationship and knew that if it did not act with due care, it could damage MAG's relationship with that third party; (3) that Precise was negligent; and (4) that Precise's negligence caused damage to MAG by negligently interfering with or disrupting the relationship and that MAG lost the economic benefits or advantage in whole or in part. *Venhaus v. Shultz*, 155 Cal. App. 4th 1072, 1078 (2007).

---

[9] The Court notes that the damages awarded here do not overlap with the damages awarded under MAG's conversion claim, so there is no double recovery.

### CIVIL MINUTES - GENERAL

| Case No. | 5:18-cv-01096-RGK-JC | Date | July 23, 2019 |
|---|---|---|---|
| Title | *MAG Aerospace Industries, LLC v. Precise Aerospace Manufacturing, Inc.* | | |

MAG presented no evidence at trial that it suffered actual damages associated with disrupted relationships with third parties.[10] Accordingly, MAG's claim for negligence interference with prospective economic relations fails.

## III.     CONCLUSION

The Court **ENTERS JUDGMENT IN FAVOR OF MAG** on its conversion and breach of contract claims in the amount of $1,317,315.78. The Court **DISMISSES** MAG's negligent interference with prospective economic relations claim.

**IT IS SO ORDERED.**

                                                                    _____ : _____

                                        Initials of Preparer        _____

---

[10] MAG may have renounced this claim. On summary judgment, MAG argued that it paid delay penalties assessed by OEMs. But in MAG's Opposition to Precise's Motion in Limine No. 6, MAG asserted that it no longer planned to seek damages for penalties. (Pl.'s Opp'n to Def.'s Mot. in Limine No. 6, ECF No. 157.) MAG also stated in its Opposition to Precise's Motion in Limine No. 5 that it was not seeking damages for lost profits or reputational harm. (Pl.'s Opp'n to Def.'s Mot. in Limine No. 5, ECF No. 156.)